**Michigan Supreme Court**
**Lansing, Michigan 48909**

# Opinion

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED JULY 17, 2001**

DAVID SHARP,

    Plaintiff-Appellant,

v                                                                    No. 116171

CITY OF LANSING,

    Defendant-Appellee.

_____

BEFORE THE ENTIRE BENCH

PER CURIAM

In this case, Plaintiff David Sharp brought a reverse discrimination claim against the city of Lansing for its use of an affirmative action plan in hiring decisions. Plaintiff alleged violations of the Michigan Civil Rights Act (CRA)[1] and

---

[1] MCL 37.2101 *et seq.*

the Equal Protection Clause of the Michigan Constitution[2]. The trial court granted summary disposition for the city, finding plaintiff's claims barred by the "safe harbor" provision of MCL 37.2210.  The Court of Appeals upheld the dismissal.[3]  238 Mich App 515; 606 NW2d 424 (1999).

It is beyond question that the safe harbor of the CRA shields a public employer with a Civil Rights Commission-approved affirmative action plan from liability under the CRA for acts undertaken pursuant to that plan.  Principally at issue is whether the safe harbor provision also shields such an employer from constitutional equal protection challenges. We hold that it does not.  We affirm in part the decision of the Court of Appeals, reverse it in part, and remand the case to the trial court.

I

BACKGROUND

Plaintiff wanted to be a firefighter with the city of Lansing Fire Department. He believed himself qualified, since he was a certified firefighter and the fire chief in Onondaga Township.  For six consecutive years, 1990-1995, he applied for a firefighter position with the city. Each time he was

---

[2] Const 1963, art 1, § 2.

[3] It reversed in part, allowing plaintiff to amend his complaint to claim discrimination based on residency. This aspect of the ruling is not in dispute.

denied employment. He believes that the city wrongfully refused to hire him because he is a Caucasian male.

The reason for the repeated rejection, according to Sharp, was the city's affirmative action plan.[4] The plan was formally approved by the Civil Rights Commission in April 1987, pursuant to § 210 of the CRA. That provision generally encourages employers to implement voluntary affirmative action plans and sets forth a procedure for doing so.

Plaintiff sued the city, seeking damages, an injunction barring further use of the affirmative action plan, and a position with the city fire department. He argued that § 210 did not bar his claim and that the city's plan operated unconstitutionally with respect to him. Defendant disagreed and moved for summary disposition on the ground that the safe harbor of § 210 precluded all liability. The trial court granted the motion before the close of discovery, relying on MCR 2.116(C)(8), (10). It concluded that the CRA provided the exclusive remedy for discrimination claims in the state and, therefore, such a claim was barred in this instance.

The Court of Appeals affirmed the trial court's grant of

---

[4]The details of the plan itself are not central to the questions presented in this case. The stated goal of the plan was to increase the percentage of minorities and women in the fire department, which was composed predominantly of white males. In the interest of achieving its goal, the city made race and gender factors in hiring decisions.

summary disposition, relying on *Cole v General Motors Corp.*[5] The panel believed that it was bound by the precedent of *Cole*; but disagreed with the reasoning employed there. It stated:

> Because plaintiff does not challenge the constitutionality of the Civil Rights Act itself, but only the validity of defendant's affirmative action plan and the actions of defendant employer, we believe that the ruling in *Cole* effectively resolves plaintiff's claim in this case. Were it not for the *Cole* decision, however, we would reach a different result. [238 Mich App 519.]

If working from "a clean slate," the Court of Appeals majority[6] added, it would not interpret § 210 as providing defendant employer with a shield from liability. Instead, it would have subjected the plan itself to constitutional review and would have held that § 210 does not "automatically" confer immunity from statutory liability under the CRA. We granted plaintiff's application for leave to appeal.

Plaintiff argues that the city's affirmative action plan should not have been approved. He asserts that the plan delegates too much authority to the city by allowing the city to make changes to it without commission approval. He contends, also, that the trial court erred by granting summary

---

[5]236 Mich App 452; 600 NW2d 421 (1999). *Cole* provided that an employer is insulated from liability under the CRA whenever it is insulated under title VII, its federal counterpart.

[6]The per curiam opinion was signed by Court of Appeals Judges Michael J. Talbot and Jane E. Markey. Judge E. Thomas Fitzgerald concurred in the result only.

disposition before discovery ended. A genuine issue of fact exists, he argues, about whether the plan ever received approval from the commission. Finally, he challenges the lower court's decision that § 210 completely immunizes defendant's actions taken in accordance with its approved affirmative action plan.

## II

## ANALYSIS

This case involves the interplay of the Equal Protection Clause of our constitution and the statutory framework of the CRA. Art 1, § 2 guarantees Michigan citizens the right to be free from racial discrimination in employment by state actors. That clause provides:

> No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. The legislature shall implement this section by appropriate legislation.

The CRA extended these protections to employment in the private sector. Thus, it prohibits racial employment discrimination by private and government employers[7], while

---

[7]Section 202 provides in pertinent part:

> (1) An employer shall not do any of the following:

> (a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an

(continued...)

5

creating a damages remedy[8] for those victimized by unlawful employment acts.

Section 210 of the CRA invites employers to implement their own affirmative action policies. Under this section, an employer's actions that would otherwise violate the CRA are permissible, provided they are taken pursuant to an affirmative action plan properly approved by the commission. Section 210 provides:

> A person subject to this article may adopt and carry out a plan to eliminate present effects of past discriminatory practices or assure equal opportunity with respect to religion, race, color, national origin, or sex if the plan is filed with the commission under rules of the commission and the commission approves the plan.

We presume that the Legislature intended the unequivocal meaning expressed in § 210. See *Nation v WDE Electric Co,* 454 Mich 489, 494; 563 NW2d 233 (1997). It provides a safe harbor for public and private employers who act in accordance with properly approved affirmative action plans. However, the safe

---

[7](...continued)
individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status. [MCL 37.2202.]

[8]Section 801(1) provides: "A person alleging a violation of this act may bring a civil action for appropriate injunctive relief or damages, or both." [MCL 37.2801.]

harbor does not shield against all claims. It merely protects employers from liability under the CRA for doing precisely what the statute itself invites them to do.

In support of its motion for summary disposition, defendant presented affidavits showing that its hiring decisions had been made pursuant to an affirmative action plan approved by the Civil Rights Commission in 1987. Plaintiff does not dispute that the commission approved defendant's 1987 plan. Rather, he argues that a genuine issue of material fact exists whether defendant actually used the approved plan in making hiring decisions between 1990 and 1995. Plaintiff contends that defendant followed different and *unapproved* plans when making the hiring decisions at issue. Moreover, he asserts, the commission "exceeded its authority" by giving to defendant the discretion periodically to adjust its hiring goals without commission approval.

The essence of plaintiff's position is that defendant's periodic revision of its hiring goals after 1987 resulted in the establishment of new affirmative action plans. He argues that these plans should have been submitted for commission approval. However, plaintiff has offered no factual support for his assertions. Accordingly, he has failed to create a genuine issue of material fact whether defendant relied on a series of separate, unapproved plans in making the hiring decisions at issue. Moreover, he has not established that

7

further discovery would uncover support for that assertion. Therefore, we reject his argument that summary disposition entered prematurely with respect to the CRA claim.

In a related vein, plaintiff suggests that the commission erred in failing to make findings of fact and conclusions of law when it approved defendant's affirmative action plan. Plaintiff did preserve the issue whether the commission was required under the Administrative Procedures Act, MCL 24.285, to make findings of fact and conclusions of law. However, for the reasons set forth in the Court of Appeals decision, MCL 24.285 is not applicable to this case. 238 Mich App 521. Accordingly, plaintiff has *not* preserved the issue whether the commission was required under § 210 to make findings of fact and conclusions of law. Thus, we conclude that the safe-harbor provision bars plaintiff's statutory claims against the city.

But our inquiry does not end there. A state actor is involved. Consequently, the protections provided directly by the state Equal Protection Clause come into play. When an aggrieved plaintiff alleges that a public employer denied his equal protection rights in violation of art 1, § 2, the employer's acts are subject to review under that constitutional provision. Injunctive and declaratory relief are available to restrain any acts found to violate the state

Equal Protection Clause.[9]  Hence, the mere existence of an approved affirmative action plan does not insulate a state employer, or its plan, from all judicial scrutiny.

In this case, plaintiff sought constitutional relief, alleging that defendant's affirmative action plan violates art 1, § 2.[10]  Defendant asserts that plaintiff did not vigorously pursue his constitutional theory either at trial or in the Court of Appeals.  It argues that such a lack of pursuit constitutes an abandonment of the claim, regardless of how it was pleaded.[11] We disagree that plaintiff failed to pursue his constitutional claim sufficiently.

Although plaintiff's presentation of this issue was somewhat scattered, the record reveals that plaintiff *did* raise the issue at various stages of the litigation.  First, he challenged the constitutionality of defendant's plan in his own motion for partial summary disposition, which was denied.  Next, he raised the issue in his motion for reconsideration of

---

[9]  However, money damages are not available to an aggrieved plaintiff under these circumstances. See *Lewis v Michigan*, 464 Mich __ ; ___ NW2d ___ (2001).

[10]In his first amended complaint, plaintiff prayed that the Ingham Circuit Court enter an order "enjoining Defendant city of Lansing from discriminating in employment on the basis of race, sex or national origin . . . ."

[11]Defendant characterizes plaintiff's claim as an effort to "vindicate equal protection rights through the vehicle of [the CRA]." Thus, according to defendant, there is no stand-alone claim for constitutional relief.

the trial court's decision granting summary disposition to defendant. Finally, he raised it in the Court of Appeals. Indeed, the Court of Appeals itself acknowledged the issue. The problem with the analyses of both the trial court and the Court of Appeals is that the lower courts apparently assumed that § 210 alone resolved plaintiff's constitutional challenge.

Hence, we find that plaintiff pleaded and pursued his constitutional theory sufficiently to provide notice to defendant of the claims against which it would have to defend. Having preserved the issue, plaintiff is entitled to be heard on his claim for injunctive relief.

The dissent's conclusion that plaintiff's constitutional challenge is barred fails to appreciate that the safe harbor provided by § 210 necessarily extends only to *statutory* claims under the CRA. There is simply no requirement that a plaintiff proceed through a statutory vehicle in order to seek declaratory or injunctive relief against an alleged violation of the state Equal Protection Clause. While the second sentence of art 1, § 2 commits its affirmative "implementation" to the Legislature,[12] the first sentence of this constitutional provision commands that "[n]o person shall

_____

[12] For this reason, we hold today in *Lewis, supra,* that we do not have authority to grant money damages or other compensatory relief for past violations of art 1, § 2.

10

be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color, or national origin." The duty imposed on the Legislature by the second sentence of art 1, § 2 to *implement* art 1, § 2 is not a power to ultimately *define* the substantive meaning of the first sentence. Accordingly, while the state judiciary cannot positively implement art 1, § 2, the judiciary has the legitimate authority, in the exercise of the well-established duty of judicial review, to evaluate governmental action to determine if it is consistent with the equal protection guarantees of the first sentence of art 1, § 2 and to invalidate such action if it is not. In short, art 1, § 2 commands the Legislature to adopt measures to practically implement its equal protection guarantees. This "implementation" language does not mean that state and local governmental entities are free to violate the substantive equal protection guarantees of art 1, § 2 merely because the Legislature has failed to address a particular type of violation.

Our dissenting colleague relies heavily on an analogy to federal law, particularly United States Supreme Court decisions related to employment discrimination claims against the federal government. The dissent portrays this case law as

11

indicating that title VII of the federal Civil Rights Act ("title VII") provides the exclusive remedy for employment discrimination by the federal government. From this, the dissent argues in essence that state statutes should be held to provide the exclusive remedy for employment discrimination claims against state or local government actors under state law. As the dissent forthrightly acknowledges, this federal case law can only be persuasive authority, not binding precedent, in resolving the present case, which involves only questions of state law. We consider the dissent's attempted analogy to federal law to be unpersuasive.

The dissent analogizes the present case to *Brown v General Services Administration,* 425 US 820; 96 S Ct 1961; 48 L Ed 2d 402 (1976). In particular, our dissenting colleague relies on language in *Brown* "that § 717 of the Civil Rights Act of 1964, as amended, provides the exclusive judicial remedy for claims of discrimination in federal employment." *Brown, supra* at 835. However, as the dissent acknowledges, the claims in *Brown* were all statutory. *Post* at 9. Thus, at most, *Brown* can only stand for the proposition that the Civil Rights Act of 1964 provides the exclusive *statutory* remedy for discrimination in employment by the federal government because *Brown* did not involve a constitutional issue. Moreover, *Brown* stated that even before the extension of title VII in 1972 to

12

cover federal employees "an action seeking to enjoin unconstitutional agency conduct would lie . . . ." *Id.* at 826. Accordingly, consistent with our holding in the present case, *Brown* accepted as an established principle that a party could seek injunctive relief against unconstitutional governmental action.

The dissent also contends that, in *Great American Savings & Loan Ass'n v Novotny,* 442 US 366; 99 S Ct 2345; 60 L Ed 2d 957 (1979), the United States Supreme Court "made clear that *Brown's* reasoning extended to encompass the notion that title VII preempts constitutionally based claims as well." *Post* at 9. We disagree because *Novotny,* a case with only private parties as litigants, did not involve any constitutional claim. In *Novotny,* the male plaintiff alleged that he suffered unlawful employment discrimination because he opposed his former employer's practice of discriminating against female employees on the basis of sex in violation of the "anti-retaliation" provision of title VII prohibiting an employer from discriminating against an employee for opposing a violation of title VII. In pertinent part, the plaintiff in *Novotny* attempted to bring suit against that employer and its directors under 42 USC 1985(3). Essentially, 42 USC 1985(3) was the modern codification of a Reconstruction Era civil rights statute that generally provided a private cause of

action against certain conspiracies to violate federally protected rights. The *Novotny* Court noted its concern that, if a violation of title VII could be asserted through this other statute, many of the provisions of title VII would be avoided. Accordingly, the *Novotny* Court declined to allow such a cause of action.

We consider the dissent's effort to analogize the present case to *Novotny* unpersuasive for two critical reasons. First, inasmuch as *Novotny* did not involve a governmental defendant, it did not involve any constitutional claim of violation of the equal protection guarantees of the United States Constitution. Second, the plaintiff in *Novotny* was attempting to redress conduct that was prohibited by title VII through another, more generalized, federal statute, and his claim that title VII was violated was an essential aspect of his claim. In contrast, while the present plaintiff cannot proceed under the CRA because of the safe harbor provided by § 210, that does not mean that he cannot claim that the conduct at issue by the city of Lansing is violative of the state Equal Protection Clause. Thus, *Novotny* is simply inapposite to whether injunctive relief is available against governmental action that is unconstitutional if it is claimed that action violates the constitutional equal protection guarantees.

The dissent further cites *Davis v Passman,* 442 US 228; 99 S Ct 2264; 60 L Ed 2d 846 (1979), in support of its discussion

14

of plaintiff's constitutional claim. *Post* at 7. However, we believe that *Davis* actually supports our analysis. In *Davis,* a female employee of a member of congress was informed by him in a letter that she was removed from her position because he concluded that it was "essential" that the position be held by a man. At that time, congressional employees like the petitioner in *Davis* were not protected from employment discrimination under title VII of the Civil Rights Act. See *id.* at 247 ("[w]hen § 717 was added to title VII to protect federal employees from discrimination, it failed to extend this protection to congressional employees such as petitioner who are not in the competitive service"). The United States Supreme Court held that the plaintiff in *Passman* could bring a cause of action directly under the Due Process Clause of the Fifth Amendment on the basis of sex discrimination in violation of its equal protection component. *Id.* at 242-244.

Properly understood then, *Davis* supports our treatment of the constitutional claim in the present case. The plaintiff in *Davis* was unable to seek relief under the generally applicable federal statute against employment discrimination because, as a congressional employee, she was not covered by that statute. Similarly, because of § 210, the state CRA provides no recourse for a person who alleges that conduct by a governmental employer pursuant to an affirmative action plan

15

properly approved under § 210 constitutes unconstitutional employment discrimination in violation of art 1, § 2. In effect, a person who may have suffered unconstitutional employment discrimination under such a plan, assuming it is adopted and approved, is not covered by the CRA. Nevertheless, as in *Davis,* such a person is able to directly challenge the alleged constitutional violation.[13] Indeed, the *Davis* Court expressly stated that "this Court has already settled that a cause of action may be implied directly under the equal protection component of the Due Process Clause of the Fifth Amendment in favor of those who seek to enforce this constitutional right." *Davis, supra* at 242. In support of this principle, the Court referred to *Bolling v Sharpe,* 347 US 497; 74 S Ct 693; 98 L Ed 884 (1954), in which the Court held that "equitable relief" was available to plaintiffs challenging racial segregation in the District of Columbia schools as violative of the Fifth Amendment. See *Davis, supra* at 242-243. As the *Davis* Court noted, the action in *Bolling* was predicated directly on the Fifth Amendment. *Davis, supra*

---

[13] Of course, the type of relief that is directly available for a violation of art 1, § 2 is different from the action for money damages against the federal government available under *Davis.* As we have discussed above, this Court's holding today in *Lewis, supra,* makes clear that there is no cause of action for money damages arising directly under art 1, § 2. Rather, a plaintiff may seek injunctive or declaratory relief against the alleged constitutional violation.

at 243.  Thus, *Bolling* and *Davis* support a conclusion that injunctive relief is available to end a constitutional violation without the need for any type of implementing statute.[14]

The United States Supreme Court decision in *Smith v Robinson,* 468 US 992; 104 S Ct 3457; 82 L Ed 2d 746 (1984), also fails to support Justice Kelly's view that plaintiff may not directly seek injunctive relief under the Michigan Constitution.  *Smith* involved claims that a handicapped child was denied a "free appropriate public education" in violation of, in pertinent part, the federal Education of the Handicapped Act (EHA), 20 USC 1400 *et seq.*, and the federal Equal Protection Clause.  *Smith, supra* at 994-995.  The pertinent issue in *Smith* was whether the petitioners could recover attorney fees under 42 USC 1988, which generally allowed such a recovery in favor of plaintiffs seeking to enforce federal constitutional rights when the specifically applicable EHA, as then in effect, made no provision for awarding attorney fees.  The Court concluded that attorney

---

[14] The dissent misapprehends our consideration of *Bolling* in stating that our use of that case "to predict the effects of a legislative act in 1972 evidences a remarkable twist of the laws of time and space." *Post* at 24, n 25.  We do not in any way rely on *Bolling* as indicating the intent of Congress in making any amendments to title VII in 1972.  Rather, we rely on *Bolling* as indicating that a court may directly grant injunctive relief against a constitutional violation without regard to the content of any statute.

17

fees could not be awarded under 42 USC 1988, because Congress "intended the EHA to be the exclusive avenue through which a plaintiff may assert an equal protection claim to a publicly financed special education." *Smith, supra* at 1009. Accordingly, the issue involved in *Smith* was actually one of statutory construction or application, not of federal constitutional law. Thus, *Smith* does not support a view that a statute may preclude injunctive relief to end a constitutional violation.

Moreover, the *Smith* Court stated *"where the EHA is available* to a handicapped child asserting a right to a free appropriate public education, based either on the EHA or on the Equal Protection Clause of the Fourteenth Amendment, the EHA is the exclusive avenue through which the child and his parents or guardian can pursue their claim." *Smith, supra* at 1013 (emphasis added). At the very most, this can only reasonably be taken to support the view that, if a statutory remedy is available for an alleged constitutional violation, a party may be required to seek to a remedy that alleged constitutional violation through the procedures provided by the statute. However, as we have discussed above, plaintiff cannot challenge the alleged unconstitutional discrimination by defendant in this case under the CRA because of the immunity provided by § 210 of the CRA. Accordingly, because the CRA is *not* available to plaintiff, *Smith* provides no

18

support for a contention that plaintiff may not directly seek injunctive relief under the Michigan Constitution.

Indeed, the *Smith* Court expressly stated:

> There is no issue here of Congress' ability to preclude the federal courts from granting a remedy for a constitutional deprivation. Even if Congress repealed all statutory remedies for constitutional violations, the power of federal courts to grant the relief necessary to protect against constitutional deprivations or to remedy the wrong done is presumed to be available in cases within their jurisdiction. [*Smith, supra* at 1012, n 15.]

This language makes clear that the United States Supreme Court in *Smith* did not regard the legislative branch as having the power through a statute to foreclose the ability of the judicial branch to order an end to constitutional violations.[15]

Our dissenting colleague also attempts to analogize the present case to a large number of lower federal court decisions, see *post* at 16-17, in support of her position with regard to plaintiff's constitutional claim, while forthrightly acknowledging that "[s]ome federal circuits have held that title VII does not necessarily provide the only remedy available for employment discrimination claims." *Post* at 16,

_____

[15] Consistent with our holding today in *Lewis, supra,* we reiterate that judicial authority under the state Equal Protection Clause is limited to providing injunctive or declaratory relief to nullify unconstitutional legislation or otherwise stop a recurring violation of the state Equal Protection Clause. As discussed in *Lewis,* because of the language of the state Equal Protection Clause, any provision for compensatory relief or similar measures to positively *implement* the clause requires legislative action.

19

n 23. Given that we have already explained why we find the United States Supreme Court decisions on which the dissent relies inapposite and that federal law can at most be persuasive, not binding, authority in resolving the state law questions involved in the present case, we will not burden readers of this opinion with a further discussion of case law from the lower federal courts.

We note that the dissent indicates that it would not allow plaintiff to pursue "parallel constitutional claims to remedy wrongs cognizable under the CRA," *post* at 28, which, in plain language, means that a discrimination plaintiff cannot say, as this one effectively has, "I do not claim that the statute is unconstitutional. I only claim the way the statute was used, or applied, is discriminatory and, thus, unconstitutional action has been engaged in by the state." In challenging such conduct as nevertheless constituting a violation of art 1, § 2 of the Michigan Constitution, plaintiff is not asserting a claim that is "parallel" to an alleged violation of the CRA, but rather is seeking to invalidate conduct that is allegedly prohibited by the Michigan Constitution even though it does not violate the act. Said plainly, the unsettling position of the dissent is that, if the state actor (i.e., the city of Lansing in this case), commits ongoing employment discrimination that violates the state Equal Protection Clause, without also violating the CRA,

20

the courts, when petitioned by the employee, have no ability to put an end to the unconstitutional discrimination. In an era in which one of the noble contributions of the state and federal courts has been to give citizens aid against discrimination, this is a startling proposition.

Our dissenting colleague also indicates that "the language of the [CRA], case law, and the legislative record persuasively support the proposition that our Legislature intended the [act] to be the sole remedy for state employment discrimination claims in Michigan." *Post* at 20. While the accuracy of this assertion may well be debatable, it is also irrelevant because it is axiomatic that the Legislature cannot grant a license to state and local governmental actors to violate the Michigan Constitution. In other words, the Legislature cannot so "trump" the Michigan Constitution.

Indeed, the ultimate import of the dissent is that, at least in the present context, a party cannot challenge discriminatory acts by a state actor in connection with its application or use of a statute as constituting unconstitutional discrimination under the state Equal Protection Clause—at least one cannot do so without also attacking the validity of the underlying statute. This is profoundly misbegotten because the power of judicial review does not extend only to invalidating unconstitutional statutes or other legislative enactments, but also to declaring other

21

governmental action invalid if it violates the state or federal constitution.

That judicial review of governmental action for its constitutionality extends to governmental action in connection with applying a statute, without requiring a review of the underlying statute itself, is reflected in both modern and historic United States Supreme Court precedent. In *Batson v Kentucky,* 476 US 79, 89; 106 S Ct 1712; 90 L Ed 2d 69 (1986), the Court held that the federal Equal Protection Clause forbids a prosecutor from using peremptory challenges to remove potential jurors on the basis of their race. The *Batson* Court did not address whether the underlying provisions of the Kentucky Rules of Criminal Procedure that allow a prosecutor to use peremptory challenges, see *id.* at 83, n 2, were unconstitutional, or in any way suggest that they were. In fact, the Court observed that it "has found a denial of equal protection where the procedures implementing a neutral statute operated to exclude persons from the venire on racial grounds." *Id.* at 88. Likewise, in the present case, the courts may review whether acts undertaken by the city of Lansing pursuant to its affirmative action plan, which was approved by the Civil Rights Commission under § 210, are violative of the state Equal Protection Clause without any need for plaintiff to challenge § 210 itself as unconstitutional.

Moreover, this is not new law. One need only refer to the venerable, and celebrated, precedent of *Yick Wo v Hopkins,* 118 US 356; 6 S Ct 1064; 30 L Ed 220 (1886), to understand this. *Yick Wo* involved two petitioners who were Chinese citizens and who were imprisoned upon convictions for violating a San Francisco ordinance that required a person to obtain the consent of the local board of supervisors to run a laundry business in a location other than a brick or stone building. Such consent was denied the petitioners and "200 others who have also petitioned, all of whom happen to be Chinese subjects, [while] 80 others, not Chinese subjects, are permitted to carry on the same business under similar conditions." *Id.* at 374. In light of this obvious discrimination, the Court considered the conclusion irresistible that the distinction was due to "hostility to the race and nationality to which the petitioners belong." *Id.* Accordingly, the Court held, without invalidating the San Francisco ordinance, that the discrimination was violative of the federal Equal Protection Clause and ordered the release of the petitioners. *Id.* Of particular note in the present case, the Court in *Yick Wo* stated:

> Though the law itself be fair on its face, and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discrimination between persons

> in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution. [*Id.* at 373-374.]

Consistent with this recognition, it is axiomatic, and has been for over a century, that the plaintiff here may challenge the particular "application" of § 210 by defendant in connection with defendant's affirmative action policies without asserting (or considering) whether § 210 is constitutional.

We note that our decision in this case certainly does not deny substantial practical effect to § 210 of the CRA.[16] Indeed, we have held that plaintiff's statutory claim under the Civil Rights Act (and with it the possibility of recovering money damages or other compensatory relief) is barred by § 210. Further, plaintiff is able to bring a constitutional claim under art 1, § 2 because the present defendant, as a governmental entity, is directly bound to obey the equal protection guarantees of this constitutional provision. At least generally, that would not be the case with regard to a private employer that uses an affirmative action plan properly approved by the Civil Rights Commission under § 210. See *Woodland v Michigan Citizens Lobby,* 423 Mich 188, 205; 378 NW2d 337 (1985) ("The Michigan Constitution's Declaration of Rights provisions have never been interpreted

---

[16] We note that the present case does not involve a challenge to the constitutionality of § 210.

as extending to purely private conduct; these provisions have consistently been interpreted as limited to protection against state action"); *Harvey v Aetna Life Ins Co,* 72 Mich App 285, 287; 252 NW2d 471 (1976) (holding that the Equal Protection Clause applies "to actions of the state and not to private conduct"). Obviously, nothing in this opinion would prevent such a private employer from relying on § 210 as a bar to an employment discrimination claim under the CRA.

Ultimately, the dissent would create a special rule for claims of employment discrimination in violation of art 1, § 2 (or at least for such claims in the affirmative action context) that would preclude a plaintiff from directly seeking injunctive or declaratory relief against governmental action as being violative of this constitutional provision. Rather, such a plaintiff would, if the dissent's view were to prevail, either have to first establish a statutory violation or argue that a state statute is unconstitutional in order to directly challenge the alleged constitutional violation. We see no appropriate basis for imposing such a heightened duty in this context.

III

CONCLUSION

We conclude that § 210 bars statutory liability under the CRA for employment discrimination where an employer acts in accordance with an affirmative action plan properly approved

25

by the commission. The decisions of the trial court and the Court of Appeals dismissing plaintiff's CRA claims are affirmed.

The existence of the safe harbor does not abrogate rights guaranteed under the Equal Protection Clause of the Michigan Constitution. We hold that the trial court erred by dismissing plaintiff's constitutional claim for injunctive relief. Moreover, plaintiff has preserved this claim for appellate review. Therefore, the Court of Appeals decision on the constitutional claim is reversed and the case is remanded to the trial court for consideration of plaintiff's prayer for injunctive relief under art 1, § 2.

CORRIGAN, C.J., and CAVANAGH, WEAVER, TAYLOR, and YOUNG, JJ., concurred.

# S T A T E   O F   M I C H I G A N

## SUPREME COURT

DAVID SHARP,

    Plaintiff-Appellant,

v                                                                No. 116171

CITY OF LANSING,

    Defendant-Appellee.

_____

MARKMAN, J. (*concurring*).

I concur in the result reached by the majority because I agree that § 210 shields a public employer with an affirmative action plan properly approved by the Civil Rights Commission from liability under the Michigan Civil Rights Act, MCL 37.2101 *et seq.*, but not necessarily from liability under the Equal Protection Clause of the Michigan Constitution, Const 1963, art 1, § 2.  Cf., however, *Lewis v Michigan*, 464 Mich ___; ___ NW2d ___ (2001).  Furthermore, I agree with the analysis set forth by the majority in reaching this conclusion.

However, I write separately to observe that, in order for an affirmative action plan to be *properly* approved by the Civil Rights Commission, it must comply fully with the requirements set forth in § 210. Section 210's safe harbor encompasses only affirmative action plans that are "adopt[ed] and carr[ied] out . . . to eliminate present effects of past discriminatory practices or assure equal opportunity . . . ." MCL 37.2210. Therefore, where the commission fails to apply these standards in its examination of an affirmative action plan, the plan has not been *properly* approved by the commission.[1]

Because plaintiff has not preserved the issue whether the commission complied with the requirements of § 210 when it

---

[1] In observing that "a complainant could challenge the commission's approval of an affirmative action plan, arguing that the plan fails to conform to criteria required by the CRA for approval," *post* at 30, the dissent apparently does not disagree with this proposition. However, the dissent asserts that my "sweeping interpretation, if accurate, would render the safe-harbor provision unworkable." *Post* at 31, n 30. I have difficulty understanding why my view is a "sweeping interpretation," when I am merely quoting *verbatim* the statutory language, i.e., "[a] person subject to this article may adopt and carry out a plan to eliminate present effects of past discriminatory practices or assure equal opportunity . . . ." MCL 37.2210. I agree with the dissent that the "safe harbor does not protect only those plans that *succeed* in eliminating present effects of past discrimination." *Id*. (emphasis added). Rather, the safe harbor protects all properly approved plans that are **"adopt[ed] and carr[ied] out . . . to eliminate present effects of past discriminatory practices or assure equal opportunity . . ."**—*but only such plans*.

2

approved defendant's affirmative action plan, the majority does not address this issue.  This silence, however, should not mislead some to believe that the commission possesses plenary authority to shield from liability *any* affirmative action plan.  Rather, the commission is confined, not only by the requirements of the constitution, but also by the requirements of § 210 itself.  To reiterate, under § 210, the commission only has the authority to approve, and thus to shield from liability under the Civil Rights Act, affirmative action plans that are "adopt[ed] and carr[ied] out . . . to eliminate present effects of past discriminatory practices or assure equal opportunity . . . ."[2]  *Id.*

---

[2] The significance of this unremarkable observation—that the language of § 210 means what it says—arises largely in the event that the constitutionality of § 210 is ultimately sustained, in particular, if predicated upon the premise that what would otherwise be unconstitutional, i.e., a hiring plan allowing the government-as-employer to treat persons differently on account of religion, race, color, or national origin, is made constitutional by virtue of the standards set forth for affording an affirmative action plan a "safe harbor."  See *City of Boerne v Flores*, 521 US 507, 519; 117 S Ct 2157; 138 L Ed 2d 624 (1997)("Congress does not enforce a constitutional right by changing what the right is.  It has been given the power 'to enforce,' not the power to determine what constitutes a constitutional violation. Were it not so, what Congress would be enforcing would no longer be, in any meaningful sense, the 'provisions of the Fourteenth Amendment.'"); *Marbury v Madison*, 5 US (1 Cranch) 137, 177; 2 L Ed 60 (1803).

S T A T E   O F   M I C H I G A N

SUPREME COURT

DAVID SHARP,

    Plaintiff-Appellant,

v                                      No. 116171

CITY OF LANSING,

    Defendant-Appellee.

_____

KELLY, J. (*dissenting*).

    I agree with the majority that the safe-harbor provision[1] of the Michigan Civil Rights Act (CRA)[2] bars statutory liability under the CRA where an employer acts in conformity with an approved affirmative action plan. I also agree that the mere existence of the safe harbor does not abrogate rights generally guaranteed under the Equal Protection Clause of the Michigan Constitution.[3] However, I cannot agree that acts of an employer that are protected by the safe harbor are subject

_____

[1]MCL 37.2210.

[2]MCL 37.2101 *et seq.*

[3]Const 1963, art 1, § 2.

to an equal protection challenge pursued directly under art 1, § 2.  Accordingly, because I believe that our Legislature intended the CRA to provide the exclusive remedy for public employment discrimination claims within the act's purview, I register my dissent.

Our constitution protects against discrimination at the hands of state actors by declaring that "[n]o person shall be denied the equal protection of the laws . . . . *The legislature shall implement this section by appropriate legislation*." Const 1963, art 1, § 2 (emphasis added).  We are bound to interpret these words in a manner that gives sufficient effect to the "law the people have made." *People v Reichenbach*, 459 Mich 109, 119; 587 NW2d 1 (1998).  The starting point for ascertaining the meaning of words used in the constitution is to interpret them according to their plain and ordinary meaning as understood by the people who adopted them.  *Bond v Ann Arbor School Dist*, 383 Mich 693, 699; 178 NW2d 484 (1970).

I. The Constitutional Convention of 1961

The reference to equal protection "of the laws," found in both the state and federal constitutions, suggests a safeguard against the formation and execution of laws or legislative classification schemes that operate unequally.  It is well settled that the equal protection guarantee is not a source of

substantive rights or liberties; rather, it is a measure of a constitution's tolerance of government classification schemes. *Doe v Dep't of Social Services*, 439 Mich 650, 661; 487 NW2d 166 (1992), citing *San Antonio Ind School Dist v Rodriguez*, 411 US 1, 24; 93 S Ct 1278; 36 L Ed 2d 16 (1973).

It seems likely from the convention record that delegates at the Michigan Constitutional Convention of 1961 had this principle firmly in mind as they formed art 1, § 2. Delegates from both political parties viewed the proposed equal protection clause as a general statement of Michigan's policies and goals with respect to public discrimination. Drafters of art 1, § 2, envisioned legislators, not constitutional delegates, as the authorities vested with the power to implement those goals. James K. Pollock, Republican chairman of the Committee on Rights, Suffrage, and Elections for the 1961 convention, observed the following as he presented his committee's proposed equal protection clause to the delegation:

> We felt that, in the event we wanted to have a specific nondiscrimination clause, it would be better to state as a general policy of the constitution that there shall be no discrimination based on race, religion or national origin in the enjoyment of political or civil rights, and *that the legislature should have the power to enforce this by appropriate legislation.* [2 Official Record Constitutional Convention 1961, pp 741-742 (emphasis added).]

To be sure, Delegate Harold Norris, a Democrat, expressed agreement with this basic principle of legislative delegation despite his disagreement with other aspects of the recommendation tendered by Pollock's committee. Professor Norris described the constitution as "a statement of goals and not a detailing of means." *Id*. at 742. Don Binkowski, another Democratic delegate on the Pollock committee, characterized the constitution as a guiding document that "must point the way" by providing a "strong, resolute and bold restatement of the principles on which this country has been founded." *Id*. at 746. He concluded his remarks to the delegation by observing "[i]t is up to you to include in the new constitution the statement of an individual's rights to equal protection of the law . . . and to provide for legislative implementation of these principles." *Id*.[4]

## II. TITLE VII

We have long recognized that federal courts' interpretations of the law under circumstances analogous to those before us on review are highly persuasive although not

---

[4]See also Cramton, The powers of the Michigan Civil Rights Commission, 63 Mich L R 5, 13 (1964) ("[Under art 1, § 2,] the legislature is empowered to create and define the 'civil rights' that it feels are deserving of protection. The nature and scope of these rights, and the remedies available for their violation, are left to legislative judgment."); *Smith v Dep't of Public Health*, 428 Mich 540, 632; 410 NW2d 749 (1987)(Brickley, J.).

necessarily binding on us. *Continental Motors v Muskegon Twp*, 365 Mich 191, 194; 112 NW2d 429 (1961). See, e.g., *State Bd of Ed v Houghton Schs*, 430 Mich 658; 425 NW2d 80 (1988).

There is no question that legislative bodies generally possess the power to enact detailed, comprehensive remedial legislation that preempts parallel claims brought directly under a constitution. The United States Supreme Court expressly recognized this fact in *Smith v Robinson*[5], where it observed:

> In light of the comprehensive nature of the procedures and guarantees set out in the [Education of the Handicapped Act] and Congress' express efforts to place on local and state educational agencies the primary responsibility for developing a plan to accommodate the needs of each individual handicapped child, we find it difficult to believe that Congress also meant to leave undisturbed the ability of a handicapped child to go directly to court with an equal protection claim to a free appropriate public education. Not only would such a result render superfluous most of the detailed procedural protections outlined in the statute, but, more important, it would also run counter to Congress' view that the needs of handicapped children are best accommodated by having the parents and the local education agency work together to formulate an individualized plan for each handicapped child's education. No federal district court presented with a constitutional claim to a public education can duplicate that process.

The *Smith* Court held that the Education of the Handicapped Act (EA) provided the exclusive avenue through

_____

[5]468 US 992, 1011-1012; 104 S Ct 3457; 82 L Ed 2d 746 (1984).

which the plaintiffs could assert an equal protection claim for publicly funded special education.[6]  Justice Blackmun recognized the possibility that broadly drafted legislation *could* preempt an entire field of substantive law.  The Supreme Court further acknowledged that a comprehensive remedial act, such as the EA, will rightfully preclude the availability of parallel constitutional claims because such duplication would undermine the thoroughness of the statutory scheme.

I find highly persuasive here the reasoning employed by the United States Supreme Court in *Smith*. It is the same rationale that backed the Court's earlier holdings that

---

[6]The statute was later amended by Congress to allow statutory and constitutional claims in tandem. Nevertheless, the reasoning of *Smith* still stands for the proposition that a comprehensive remedial scheme *will* preclude parallel constitutional claims.  See *Zombro v Baltimore Police Dep't*, 868 F2d 1364, 1368 (CA 4, 1989)(using *Smith* for the proposition that "[t]he Supreme Court has similarly demonstrated a disinclination to entertain § 1983 actions in which plaintiffs have bypassed a comprehensive statutory remedy in favor of a § 1983 claim predicated on an alleged constitutional violation"); *Mattoon v City of Pittsfield*, 980 F2d 1, 6 (CA 1, 1992)(relying on *Smith* for the conclusion that "even assuming a 'fundamental constitutional right' to safe public drinking water, it would not alter the present analysis. Comprehensive federal statutory schemes, such as the [Safe Drinking Water Act], preclude rights of action under § 1983 for alleged deprivations of constitutional rights in the field occupied by the federal statutory scheme"); *Pfeiffer by Pfeiffer v Marion Center Area Sch Dist*, 917 F2d 779, 789 (CA 3, 1990)(holding that *Smith* is part of a consistent application by the Supreme Court of the doctrine that a comprehensive enforcement scheme will preclude parallel constitutional claims).

6

Congress intended title VII[7] to provide the exclusive judicial remedy for discrimination claims in the federal employment sector. See *Brown v General Services Administration;*[8] *Great American Fed S & L Ass'n v Novotny*[9]; *Davis v Passman.*[10]

*Brown* involved an African-American federal government employee who claimed that the General Services Administration (GSA) had racially discriminated against him by failing to promote him to a higher grade.  He filed a complaint with the GSA, then appealed to the federal Civil Service Commission, both of which ruled against him. He then appealed from the commission decision to a federal district court.  The suit alleged jurisdiction under title VII as amended by the Equal Employment Opportunity Act of 1972,[11] the general federal-question statute,[12] the declaratory judgment act[13] and the Civil Rights Act of 1866, as amended.[14]  The district court

---

[7]42 USC 2000e *et seq*.  (This was the Civil Rights Act of 1964.  References to § 717 and § 717a are to that act.  Many courts refer to the section numbers from that act.)

[8]425 US 820, 835; 96 S Ct 1961; 48 L Ed 2d 402 (1976).

[9]442 US 366; 99 S Ct 2345; 60 L Ed 2d 957 (1979).

[10]442 US 228; 99 S Ct 2264; 60 L Ed 2d 846 (1979).

[11]42 USC 2000e *et seq*.

[12]28 USC 1331.

[13]28 USC 2201-2202.

[14]42 USC 1981.

dismissed the entire action for failure to conform to the procedural requirements of § 717 of the Civil Rights Act of 1964.[15] The Court of Appeals affirmed. *Brown v General Services Administration*, 507 F2d 1300 (CA 2, 1974).

In deciding the case, the Supreme Court engaged in a detailed review of the legislative history underlying the enactment of the 1972 amendments to title VII. It noted that comprehensive administrative, judicial and remedial schemes have been included there. It viewed the enactment of § 717 as clear evidence of what Congress intended when it passed the 1972 title VII amendments. It quoted extensively from committee reports and floor debates to ascertain the will of Congress, before concluding:

> This unambiguous congressional perception seems to indicate that the congressional intent in 1972 was to create an exclusive, pre-emptive administrative and judicial scheme for the redress of federal employment discrimination. [*Brown*, 425 US 828-829.]

*Brown* denounced the idea that circuitous pleading might enable a party to avoid the preemptive scheme set forth in title VII. It observed that an attempt to circumvent the command of title VII would defeat Congress' purpose of amending the statute in 1972.

---

[15]42 USC 2000e-16 (title VII), as amended in 1972.

8

> The crucial administrative role that each agency together with the Civil Service Commission was given by Congress in the eradication of employment discrimination would be eliminated "by the simple expedient of putting a different label on (the) pleadings." It would require the suspension of disbelief to ascribe to Congress the design to allow its careful and thorough remedial scheme to be circumvented by artful pleading. [*Brown*, 425 US 833, quoting *Preiser v Rodriguez*, 411 US 475, 489-490; 93 S Ct 1827; 36 L Ed 2d 439 (1973).]

Ultimately, the Supreme Court concluded that the plaintiff's other statutory claims were preempted by title VII. It affirmed the lower courts and held:

> [T]he established principle [found in *Preiser*] leads unerringly to the conclusion that § 717 of the Civil Rights Act of 1964, as amended, provides the exclusive judicial remedy for claims of discrimination in federal employment. [*Brown*, 425 US 835.]

Though the remedies sought in *Brown* were all statutory, its holding was broader and unqualified. In *Novotny*, *supra*, the Supreme Court made clear that *Brown's* reasoning extended to encompass the notion that title VII preempts constitutionally based claims as well. Novotny brought an equal protection claim through the vehicle of § 1985(3),[16] and an action under § 704(a),[17] the retaliatory discharge provision of title VII. The *Novotny* Court relied on the principles set forth in *Brown* to hold that title VII foreclosed plaintiff's

---

[16]42 USC 1985(3).

[17]42 USC 2000e-3(a).

equal protection claim.  It recognized that the availability of parallel constitutional relief, under these circumstances, would dramatically undercut the effectiveness of title VII. Comparing *Novotny* to *Brown*, the Supreme Court stated:

> Here, the case is even more compelling.  In *Brown*, the Court concluded that § 717 displaced other causes of action arguably available to assert substantive rights similar to those granted by § 717.  Section 1985(3), by contrast, creates no rights. It is a purely remedial statute, providing a civil cause of action when some otherwise defined federal right—to equal protection of the laws or equal privileges and immunities under the laws—is breached by a conspiracy in the manner defined by the section.  Thus, we are not faced in this case with a question of implied repeal.  The right Novotny claims under § 704(a) did not even arguably exist before the passage of Title VII.  The only question here, therefore, is whether the rights created by Title VII may be asserted within the remedial framework of § 1985(3). [*Novotny, supra* at 376.]

The Supreme Court answered this question in the negative. Applying *Brown's* holding broadly,[18] it observed that

_____

[18]The majority opinion relies on *Davis, supra* for the proposition that a constitutional claim can proceed where a plaintiff is not covered by title VII. This is accurate. However, in analogizing the specific facts of *Davis* to this case, the majority overlooks the distinction that the claim at issue in *Davis* did not fall under the umbrella of title VII. The plaintiff there, by virtue of her status as a congressional employee, was not eligible for coverage under title VII. Thus, her ability to pursue a constitutional remedy would not undercut title VII's remedial scheme. Indeed, the *Davis* Court reaffirmed *Brown's* exclusivity principle.

By contrast, this case involves an individual, Mr. Sharp, who is protected by the applicable legislation, the CRA. He is not barred by having a status that renders him outside the

(continued...)

restricting the plaintiff to an action under title VII was the only way to preserve the integrity of title VII's remedial scheme. Notwithstanding Novotny's broad constitutional claims, the Supreme Court continued:

> If a violation of Title VII could be asserted through § 1985(3) [in the form of a constitutional claim], a complainant could avoid most if not all of these detailed and specific provisions of the law. . . . Perhaps most importantly, the complaint could completely bypass the administrative process, which plays such a crucial role in the scheme established by Congress in Title VII. [*Id*. at 375-376.]

The majority responds that *Novotny* "did not involve any constitutional claim[s]" and therefore does not aid us in determining whether a statute can ever preempt a claim brought directly under the constitution.[19] My colleagues acknowledge that *Novotny* brought a claim under § 1985(3), but ignore the underlying substantive posture of any action pursued through the vehicle of § 1985(3). Although § 1985 is certainly a statute, it "creates no rights," the *Novotny* Court observes, and is thus activated only "when some otherwise defined federal right—*to equal protection of the laws* or equal

---

[18](...continued)
scope of its contemplation. His inability to state a successful claim under the CRA does not place him in the same position as the plaintiff in *Davis*. Factually speaking, he more closely resembles the plaintiffs in *Brown* and *Novotny*, where the Supreme Court restricted access to alternative parallel remedies. *Davis, supra* at 247, n 26.

[19]Slip op at 13.

privileges and immunities under the laws—is breached by a conspiracy in the manner defined by the section." *Novotny*, *supra* at 376. [Emphasis added.]

Hence, § 1985 is a remedial vehicle to pursue the vindication of constitutionally guaranteed rights. The *Novotny* Court was unequivocal when it declared that a violation of rights contemplated under title VII could not be asserted through a § 1985(3) claim. *Id.* at 375-376. It opined that pursuit of such a remedy would enable a complainant to "avoid most if not all of [the] detailed and specific provisions of the law." *Id.* The majority is inaccurate in suggesting that using § 1985(3) to vindicate a violation of a constitutional right is substantively different than suing directly under the constitution.

The majority uses its flawed analysis of *Novotny* as a springboard from which to leap to the general proposition that a legislative act can never "trump" the constitution. Nowhere in *Novotny* can one locate the principle that the majority attributes to it. Indeed, when the Supreme Court has addressed the subject of statutory preemption of constitutional remedies, it has reached the opposite conclusion.[20] It cannot be accurately said that *Novotny* lends

---

[20]See *Smith v Robinson*, n 6 *supra*, which lists federal cases that apply *Smith* in finding a statutory preemption of

(continued...)

credence to the conclusion that a constitutional claim can never be preempted by statute.

The majority is unpersuasive in its attempt to distinguish *Smith v Robinson*, the Supreme Court case that *directly* addresses the principle of statutory preemption of parallel constitutional claims.[21]  As discussed above, the *Smith* Court held that a complainant's equal protection claim was preempted by a statute, the EA.  The majority reads *Smith* to mean only that "if a statutory remedy is available for an alleged constitutional violation, a party may be required to seek to remedy that alleged constitutional violation through procedures provided by the statute."  Slip op at 18-19.  It then finds that Miss Smith's claims were covered by the EA. and that *Smith* is inapposite here.

The flaw in its logic lies in its premise.  In *Smith*, the principle claim involved the right of a handicapped child to a free public education.  The claim that went to the United States Supreme Court was for attorney fees.  Under the facts in *Smith*, the plaintiff was covered by the act and was unable

---

[20](...continued)
**constitutional claims.**

[21]The majority chooses not to "burden the readers of this opinion with a further discussion of case law from the lower federal courts," slip op at 17, but opts to ignore the considerable line of federal cases that have applied *Smith* to find statutory preemption of constitutional claims. See n 6.

13

to obtain attorney fees under an equal protection claim. Under the facts in *Sharp*, plaintiff was covered by the act and sought relief for various equal protection claims. Hence, in each case a statutory remedy was available to and sought by the plaintiff and the plaintiff sought relief, as well, for the same alleged wrongs through a direct constitutional due process claim. Consequently, *Smith* is *pertinent* and supports my conclusion that a comprehensive legislative scheme can preempt certain constitutional claims where the Legislature is authorized and intends to preempt an entire field of law.

In attempting to distinguish the holding in *Smith* from the one I propose today, the majority points to a footnote in *Smith*. In it, the United States Supreme Court remarks that, if there were no statutory remedies for constitutional violations,

> the power of federal courts to grant the relief necessary to protect against constitutional deprivations or to remedy the wrong done is presumed to be available in cases within their jurisdiction. [*Id.* at 1012, n 15, quoted *ante* at 19.]

This observation has no bearing on what the Court in *Smith* actually did decide: when the Legislature implements a comprehensive remedial scheme to rectify certain constitutional equal protection rights, the scheme will preempt parallel constitutional claims.

14

The footnote is dictum because the *Smith* Court found that Congress *had* implemented such a comprehensive remedial scheme in the EA. Examined closely, the footnote stands only for the proposition that, absent a statutory scheme to remedy equal protection violations, courts can grant appropriate relief directly under the constitution.

This goes precisely to my point. Indeed, if there were no title VII, or no EA, there certainly would exist a role for the courts in remedying the constitutional deprivations those statutes address. The courts, within jurisdictional limitations, would fill the void in legislation and right wrongs through claims brought directly under the constitution. Yet the fact that Congress *did* enact such legislation is thought to manifest dissatisfaction with existing remedies the courts were providing. It is said to evidence a desire, instead, to replace unsuccessful solutions with a comprehensive scheme that preempts the field, including the very preexistent constitutional claims that warranted the legislation. Hence, the holding of *Smith* is that the EA's legislative history leads to the conclusion that the act "is the exclusive avenue through which the child and his parent or guardian can pursue their claim." *Id*. at 1013.

Therefore, despite the majority's unsubstantiated assertion that a statute cannot "trump" the constitution,

federal courts have long acknowledged the opposite principle.[22] Consistent with the logic working in *Smith*, these courts have applied *Brown* and *Novotny* to hold that title VII preempts constitutional equal protection claims that fall within the jurisdiction of the statute[23]. See, e.g., *Ethnic Employees of the Library of Congress v Boorstin*, 243 US App DC 186, 196; 751 F2d 1405 (1985)(observing that "[a]llowing federal employees to recast their title VII claims as constitutional claims would clearly threaten those same policies"); *Day v Wayne Co Bd of Auditors*, 749 F2d 1199, 1204-1205 (CA 6, 1984); *Kizas v Webster*, 227 US App DC 327, 345; 707 F2d 524 (1983)(a Fifth Amendment claim based upon race and sex discrimination

---

[22]As stated in n 6, numerous federal cases have cited *Smith* as authority for making the type of ruling that the majority claims cannot be made.

[23]Some federal circuits have held that title VII does not necessarily provide the only remedy available for employment discrimination claims. See, e.g., *Beardsley v Webb*, 30 F3d 524, 527 (CA 4, 1994). However, many of these decisions dealt with claims arising from facts beyond the contemplation of title VII, such that recognizing them would not encroach upon the area defined by title VII.

Even those circuits that have interpreted *Brown* narrowly have not, as the majority suggests, done so on the basis of any distinction between legal and equitable remedies. See, e.g., *Annis v Westchester Co*, 36 F3d 251 (CA 2, 1994); *Notari v Denver Water Dep't*, 971 F2d 585 (CA 10, 1992). Instead, most have so held on the basis that they disagree about the scope of coverage that Congress intended. The majority offers no case holding that it is beyond the inherent power of any legislative body to enact a statutory scheme that preempts parallel constitutional claims.

16

was barred by title VII); *Purtill v Harris*, 658 F2d 134, 137 (CA 3, 1981)(relying on *Brown* to hold that the Age Discrimination in Employment Act, modeled after title VII, preempts judicial remedies based directly on the constitution for claims of age discrimination in federal employment); *Lawrence v Staats*, 214 US App DC 438, 439-441; 665 F2d 1256 (1981) (a Fifth Amendment claim based on race discrimination would be barred if § 717 applied); *Davis v Califano*, 198 US App DC 224, 225, n 1; 613 F2d 957 (1979); *Hofer v Campbell*, 189 US App DC 197, 200; 581 F2d 975 (1978)(a Fifth Amendment claim based on national origin discrimination was barred by title VII); *Richardson v Wiley*, 186 US App DC 309, 310; 569 F2d 140 (1977); *Gissen v* Tackman, 537 F2d 784, 786 (CA 3, 1976); *Lutes v Goldin,* 62 F Supp 2d 118 (D DC, 1999); *Brug v Nat'l Coalition for the Homeless*, 45 F Supp 2d 33, 42 (D DC, 1999); *Clement v Motta*, 820 F Supp 1035 (WD Mich, 1991).

In *Kizas*, the United States Court of Appeals for the District of Columbia rejected a reverse discrimination claim brought by white clerical and support employees of the Federal Bureau of Investigation. The complainants alleged that including affirmative action principles in the qualifying process for special agents violated their Fifth Amendment constitutional right to equal protection as well as their statutory title VII rights. The court concluded that the

plaintiffs' constitutional claim was "unavoidably foreclosed by [the] precedent" of *Brown*. *Kizas*, at 345. Their sole remedy was under title VII. The *Kizas* Court observed:

> The Kizas complainants suggest, in repeated but less than lucid argument, that the Constitution's equal protection principle entails a stricter restraint on classification by race or sex than does Title VII and would shelter them against "reverse" discrimination that the statute may permit. We need not linger over this suggestion. . . .
>
> They may not circumvent the "careful and thorough remedial scheme" Congress ordered for them; their access to court is determined by that effective, albeit demanding statute. [*Kizas*, at 345-346.]

## III. THE CRA

In the instant case, Sharp is covered by the protections afforded through the CRA—a legislative enactment every bit as detailed and comprehensive as its federal counterpart, title VII.

Section 717 contains a general prohibition of federal employment "discrimination based on race, color, religion, sex, or national origin." § 717(a). Michigan's CRA contains a proscription at MCL 37.2202(1), which provides in part:

> An employer shall not . . . . :
>
> (a) Fail or refuse to hire, or recruit, or discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status.

18

Section 717 also provides the Civil Service Commission with the power and authority to enforce the civil rights requirements of title VII. Michigan vests its own Civil Rights Commission with similar enforcement powers. Article 6 of the CRA delegates powers and duties to the commission, MCL 37.2601, and the Civil Rights Department, MCL 37.2602. Section 602(c) establishes in the Department the authority to

> [r]eceive, initiate, investigate, conciliate, adjust, dispose of, issue charges, and hold hearings on complaints alleging a violation of this act, and approve or disapprove plans to correct past discriminatory practices which have caused or resulted in a denial of equal opportunity with respect to groups or persons protected by this act.

In addition, § 717(c) outlines a detailed administrative grievance procedure that a complainant must follow before filing suit in federal district court. It gives an aggrieved federal employee thirty days from a final order of the Civil Service Commission to register an appeal in a district court.

Michigan's CRA provides an almost identical structure. See MCL 37.2605-37.2606. Section 605 requires the state commission to issue written findings of fact and conclusions of law to support a conclusion that an employer has engaged in discriminatory practices. The section also details the various remedies available to the commission following a finding of discrimination in violation of the CRA. Finally, § 606 provides the complainant with the right to appeal from

19

any final decision of the commission to a circuit court within thirty days.

The parallels that exist between title VII and the CRA are undeniable. Similarly, the concerns apparent in *Brown* and *Novotny* about parallel claims that threaten to dilute the comprehensive scheme carefully crafted by Congress also exist here. Michigan's CRA provides the kind of detailed scheme that the United States Supreme Court recognizes as providing the sole remedy for claims arising under its coverage umbrella.

## IV. LEGISLATIVE INTENT

Moreover, the language of the act, case law, and the legislative record persuasively support the proposition that our Legislature intended the CRA be the sole remedy for state employment discrimination claims in Michigan. The primary goal of statutory interpretation is to ascertain and give effect to the intent of the Legislature. *Frankenmuth Mut Ins v Marlette Homes, Inc*, 456 Mich 511, 515; 573 NW2d 611 (1998). Like title VII, the CRA does not contain an express description of its position in the constellation of antidiscrimination law. Thus, it is appropriate to look for legislative intent in other, less obvious places. *Brown*, *supra* at 825. "Where the mind labours to discover the design of the legislature, it seizes everything from which aid can be

20

derived . . . ." *United States v Fisher*, 6 US (2 Cranch) 358, 386 (1805).

To begin, the language of the CRA itself manifests an apparent intent to establish a broad, comprehensive scheme that "defines" and remedies violations of civil rights. The preamble to the CRA begins: "An act to *define civil rights . . . .*" 1976 PA 453 (emphasis added). It continues by describing its own purpose as "to prohibit discriminatory practices" and "to provide remedies and penalties . . . ." *Id.* Thus, on its face, the CRA shows that the Legislature envisioned it as comprehensive and detailed.

The legislative history, as gathered from House and Senate bill analyses generated before the act's passage in 1976, bears out this suggestion. The legislative documents explain that the act was intended to address the problems caused by the splintered remedial systems that existed before 1976 in the area of civil rights. The report accompanying House Bill 4055 described the bill as a consolidation of these concepts into a single law that would

> place legal and procedural recourse for *all civil rights discrimination* within the Department of Civil Rights, enabling the Department to provide more effective remedies for those who have been victimized by unlawful discrimination. [Emphasis added.]

The bill analysis further describes the bill as a means of "[outlining] more specifically the *legal action a person*

21

*could take* if that person feels that he or she has been unfairly discriminated against." (Emphasis added.) The "Argument For:" section of the bill analysis includes the following two statements of purpose, both bearing particular relevance to this case:

> The bill would provide a *uniform statutory framework* to deal with the many different forms of discrimination. [Emphasis added.]

> * * *

> The bill would include the concept of discrimination enunciated by the U.S. Supreme Court with respect to equal protection under the Constitution.

Hence, the CRA, like its federal counterpart, was intended as a vehicle to define and consolidate the various remedial measures accorded by other statutes. Moreover, it was envisioned as incorporating the "concept of discrimination" inherent in the Equal Protection Clause.[24]

Courts have interpreted the CRA as bearing a singular objective in harmony with the Michigan Constitution and as an instrument to interpret and enforce its provisions. See, e.g., *Thompson v Bd of Ed Romeo Comm Schs*, 519 F Supp 1373, 1380 (WD Mich, 1981) (interpreting Michigan law to conclude that the

---

[24]The Equal Protection Clause of Michigan's Constitution is virtually identical to its counterpart contained in the Fourteenth Amendment of the United States Constitution. They are interpreted as embodiments of the same concepts. See, **e.g.,** *Moore v Spangler*, 401 Mich 360, 370; 258 NW2d 34 (1977); *Naudzius v Lahr*, 253 Mich 216, 222; 234 NW 581 (1931).

22

"general object [of the CRA] is to define and protect certain civil rights of individuals under the jurisdiction of Michigan law"); *Neal v Dep't of Corrections*, 232 Mich App 730, 734; 592 NW2d 370 (1998)("[t]he act is remedial and must be liberally construed to effectuate its ends").

I find that the intent that appears to underlie the CRA supports the proposition that the Legislature meant it to provide the sole remedy for public employment discrimination claims in Michigan. Moreover, the United States Supreme Court's decisive interpretation in *Brown, Novotny,* and their progeny of the breadth of § 717 of title VII renders convincing guidance in determining the breadth of Michigan's CRA. Just as title VII provides the sole remedy for equal protection claims involving federal governmental employment discrimination, the CRA provides the sole remedy for Michigan governmental employment discrimination.

## V. ANALOGY

A Michigan complainant like Mr. Sharp is in the same position as the complainants in *Kizas*. He may not circumvent the "careful and thorough remedial scheme" that the Legislature, in response to the direct call of the people, has ordered for him. *Kizas*, at 346. His access to court "is determined by that effective, albeit demanding, statute." *Id.* He may not pursue a state constitutional equal protection

23

claim that falls within the purview of the CRA.[25]   Allowing

that a parallel and circuitous claim would dilute the CRA's

purpose, just as allowing Novotny to seek constitutional

redress would have diluted the carefully crafted scheme of

title VII.

In addition to the persuasiveness of federal analogous

law is the sheer counter intuitiveness of allowing an equal

protection claim to survive in this case.  If a complainant

were entitled to relief under the state Equal Protection

Clause as an alternative to the CRA, the safe harbor provision

---

[25]The majority intimates that *Lewis v Michigan*, 464 Mich
___; ___ NW2d ___ (2001), issued with this decision, holds
that a complainant has a direct claim under the constitution
for equitable relief from an approved affirmative action plan.
Slip op at 15, n 13. The issue in *Lewis* is whether this Court
should recognize the existence of a claim for monetary damages
directly under the Equal Protection Clause. It does not
address whether a party can seek equitable relief under the
auspices of the constitution.

The majority miscasts my position in this dissent as one
that leaves certain Michigan citizens entirely without civil
rights or constitutional protections. Also, it cites *Bolling
v Sharpe*, 347 US 497; 74 S Ct 693; 98 L Ed 884 (1954) as
assuming that Congress would amend title VII eighteen years
later to retain the availability of equitable relief directly
under the constitution. The use of a 1954 Supreme Court case
to predict the effects of a legislative act in 1972 evidences
a remarkable twist of the laws of time and space. Moreover,
*Bolling* is inapposite because it describes federal employment
discrimination remedies that existed before 1972. The 1972
amendments of title VII were aimed at altering the legal
foundation for pursuing federal employment discrimination
claims in the public sector. *Brown*, *Novotny, Smith,* and each
case upon which I rely, concern the state of employment
discrimination law *after* 1972.

would be dramatically weakened.  If the safe harbor were destroyed, the CRA would fail in one of its essential purposes:  to provide for affirmative action in order to alleviate past instances of discrimination.

In turn, the delegates to the 1961 Constitutional Convention would have failed in their attempt to draft art 1, § 2 as a set of policy goals "pointing the way" for the Legislature.  Such a result is inconsistent with the expressed policy goals of the constitutional framers and the intent of the Legislature in enacting the CRA.  In addition, it ignores the persuasive direction charted by the United States Supreme Court in *Brown,*[26] *Novotny*, and  their respective progeny.

---

[26]To counter the unqualified, direct holding of *Brown*, the majority relies on a misreading of it. *Brown* does not state that the 1972 amendments to title VII left intact the availability of injunctive relief for federal employment discrimination directly under the Fifth Amendment. There is little question that the *Brown* Court regarded earlier remedies for employment discrimination in the public sector as impotent. See *Brown*, *supra* at 826 ("If administrative remedies were ineffective, judicial relief from federal employment discrimination was even more problematic before 1972.") Injunctive relief, like the balance of remedies available before 1972, effected nothing to merit celebration among opponents of workplace discrimination.

According to the *Brown* Court, that was the weakness that Congress intended to address through the Equal Employment Opportunity Act of 1972.  Its aim was to preempt the field by providing a comprehensive, exclusive slate of remedies, displacing existing legal *and equitable* claims. I find that our Legislature intended the CRA to have similar preemptive force.

A more detailed analysis of whether plaintiff has pleaded and preserved any other direct constitutional claim is appropriate here.

MCR 2.111 provides:

> (B) Statement of Claim. A complaint, counter-claim, cross-claim, or third-party complaint must contain the following:
>
> (1) A statement of the facts, without repetition, on which the pleader relies in stating the cause of action, with the specific allegations necessary reasonably to inform the adverse party of the nature of the claims the adverse party is called on to defend[.]

In his second amended complaint, plaintiff pleaded as follows:

> 7. Notwithstanding rejection of Plaintiff's application for employment as a fire fighter in the Lansing fire department, Defendant city of Lansing and the Lansing fire department have continued to accept applications for employment and have continued to hire persons as fire fighters who are not certified fire fighters and not as well qualified as Plaintiff.
>
> ***
>
> 10. Defendant city of Lansing and its fire department have limited, segregated or classified plaintiff in a way that tends to deprive him of employment opportunities in the public fire department of the city of Lansing, or otherwise adversely affects his status as an applicant because of his race and sex.
>
> ***
>
> 13. Defendant city of Lansing has adopted a policy of discriminating in employment on the basis

of race, sex and national origin by means of treating white male applicants for employment less favorably than applicants who are not white males.

14. Defendant city of Lansing has applied its policy of discriminating in employment on the basis of race, sex and national origin to the Lansing fire department.

15. Defendant city of Lansing and its fire department have manipulated facially neutral testing procedures to discriminate on the basis of race, sex and national origin by means of giving second, third and fourth chances to members of favored races, sex or national origin.

\*\*\*

18. Defendant city of Lansing obtained approval for a voluntary affirmative action plan in 1987 but has abandoned the approved plan.

19. Defendant's affirmative action plan lacks any rational connection with a legitimate governmental objective for the reason that ten years of enforcement of the said voluntary affirmative action plan has had no effect on the distribution of women and minorities in the non-supervisory ranks of the Lansing fire department.

20. Defendant city of Lansing adopted both its *approved* voluntary affirmative action plan, and its *unapproved* voluntary affirmative action plan with intent to discriminate on the basis of race and sex.

21. The only effect of ten years of voluntary affirmative action in the Lansing fire department has been to deprive white males of employment opportunities in the Lansing fire department.

22. Plaintiff has sustained damages in the premises in excess of $10,000.00, in violation of the form of the Elliott Larsen Civil Rights Act and Const 1963, art 1, § 2.

Wherefore, Plaintiff prays that this Honorable Court enter its order enjoining Defendant city of Lansing from discriminating in employment on the basis of race, sex or national origin . . . .

Plaintiff's pleadings acknowledge the apparent constitutionality of an affirmative action plan that has been approved by the commission and enacted in conformity with § 210. There is no dispute that the city's plan satisfies both criteria. In his answer to defendant's affirmative defenses, plaintiff stated:

Plaintiff affirmatively avers that an affirmative action plan may be adopted and carried out "*if* the plan is filed with the commission under rules of the commission and the commission approves the plan."

As the majority concedes, plaintiff is barred from pursuing a claim under the CRA. By extension, then, he has failed to state a cognizable claim under the Equal Protection Clause of the Michigan Constitution. Simply stated, he has nothing left to pursue on remand.

The majority misrepresents my position as asserting that the *only way* to challenge a state actor's implementation of a law is to challenge the law itself. It interprets this dissent as in conflict with *Batson v Kentucky*, 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986),[27] and *Yick Wo v Hopkins*, 118

---

[27]*Batson* held that the federal Equal Protection Clause forbids a prosecutor from using peremptory challenges to remove potential jurors because of race.

US 356; 6 S Ct 1064; 30 L Ed 220 (1886).[28]  In so doing, it overlooks a crucial fact that distinguishes *Batson* and *Yick Wo* from the instant case:  the relationship of the underlying "law" to the conduct alleged in this case is distinguishable from the relationship of those two variables as they operated in *Batson* and *Yick Wo*.  The key difference is that § 210 *expressly allows* the conduct in which defendant engaged.  It permits racial discrimination within certain parameters.  The city of Lansing governed itself within those constitutional parameters.  Though he tried, Mr. Sharp could not establish a factual issue to the contrary.

By contrast, the underlying law in *Batson* did not expressly allow the conduct in which the Kentucky prosecutor engaged.  The "law" in *Batson* did not permit prosecutors to exercise peremptory challenges on the basis of race.  It did not even address race.  Thus, the unconstitutional implementation at work in *Batson* was found in the "deviation" from what the underlying constitutional law would allow.  That "law" had been applied to Batson in a way that denied him equal treatment under it.  I apply the same standard to Mr. Sharp's claim, but reach a different result because the law in

_____

[28]The *Yick Wo* Court found an equal protection violation where an otherwise neutral San Francisco city ordinance was applied unequally to citizens on the basis of race.

his case operated exactly as legislators intended it should.[29] There was no deviation from the scheme intended by the Michigan Legislature.

However, despite Mr. Sharp's failure to articulate a cognizable claim, another in his position would not necessarily be without a remedy. A complainant could challenge the constitutionality of the CRA generally, or of the safe harbor, testing whether either constitutes a constitutional implementation of art 1, § 2. Sharp chose not to do so. Alternatively, a complainant could challenge the commission's approval of an affirmative action plan, arguing that the plan fails to conform to criteria required by the CRA for approval.[30] Again, Sharp chose not to pursue such a claim.

---

[29]Similarly, in *Yick Wo,* the law at issue did not expressly authorize discrimination on the basis of race. It established an approval process for operating certain types of laundry businesses in San Francisco. The process was used to deny business opportunities to Chinese immigrants, while granting them to non-Chinese applicants. The "law" in *Yick Wo* did not authorize city officials to treat Chinese applicants differently than others. Rather, it established a neutral permitting process. City officials applied that law unequally, thereby violating the equal protection guarantee of the constitution. Such a fact pattern is easily distinguishable from the instant case, where an admittedly constitutional statute prescribes the very discrimination from which plaintiff claims to have suffered.

[30]The concurrence is mistaken in its suggestion that I agree that the "safe harbor encompasses only affirmative action plans that are 'adopt[ed] and carr[ied] out . . . to eliminate present effects of past discriminatory practices or assure equal opportunity . . . .'" Slip op at 2. The safe

(continued...)

Finally, a complainant could articulate a challenge to a public employer's actions in implementing a plan, by demonstrating that they fell outside the scope authorized by § 210. He could establish a fact question on such a claim by showing, hypothetically, that the employer hired a minority firefighter despite the fact that the individual had failed a required physical examination. Hiring such a candidate, who would not be qualified even with the benefit of the affirmative action plan, would not fall within the protection of the safe harbor. A complainant could establish a fact question whether the employer used some other *unapproved* plan, thereby violating complainant's rights. Such acts would not be protected by the safe harbor and the complainant's art 1, § 2 rights could be vindicated under the CRA.

Sharp attempted to create a fact question under certain of these theories, but failed. Hence, he is now left with nothing by way of an action arising either under the CRA or directly under art 1, § 2. With no cognizable claims

[30](...continued)
harbor does not protect only those plans that succeed in eliminating present effects of past discrimination. Section 210 contemplates protection for any properly approved plan that is reasonably created with the intention of eliminating discrimination or furthering equal opportunities in the workplace. The section specifically refers to plans "to" eliminate effects of discrimination, not plans "that" do in fact eliminate them. The concurrence's sweeping interpretation, if accurate, would render the safe-harbor provision unworkable.

31

remaining that have not already been discharged, his cause was properly dismissed by the Court of Appeals.

## VII. Conclusion

I agree with the majority that the safe harbor protects the city of Lansing from an action against it under the CRA. I further acknowledge that the Legislature cannot abrogate constitutional rights through passage of a statute. However, the constitution can delegate authority. The CRA is the Legislature's response to one such constitutional delegation of authority. I believe that art 1, § 2, envisioned that the Legislature would pass an act like the CRA that could be the exclusive remedy for vindicating civil rights claims against public employers in Michigan. I base this conclusion on the expressed intent of certain constitutional convention delegates and by analogy to a persuasive line of federal authority regarding title VII and the federal equal protection clause. The CRA closely resembles title VII that the United States Supreme Court in *Brown* and *Novotny* held preempted the field of employment discrimination claims under federal law.

Allowing the pursuit of parallel constitutional claims to remedy wrongs cognizable under the CRA is not only illogical, it threatens to undermine and destroy the comprehensive design of the statute. Such a contrary ruling could not reflect the intent of either the Legislature in passing the act or the

32

people in adopting the Michigan Constitution.

The majority first misconstrues my position, then finds it "a startling proposition." Slip op at 18. It states my position as being that, if a state actor commits ongoing employment discrimination violative of the state Equal Protection Clause but not violative of the CRA, the courts cannot end the discrimination. My position is that, if a state actor commits employment discrimination by performing acts covered by the CRA, the state Equal Protection Clause cannot be used to end the discrimination.

I have demonstrated that this proposition has extensive support in holdings of the United States Supreme Court. Moreover, a contrary holding, the majority's holding, sadly weakens the "noble contributions of the state and federal courts" in fighting discrimination that it purports to esteem.

The majority states that my reading of the law allows the Legislature to "trump" the Michigan constitution. It says that "it is axiomatic that the Legislature cannot grant a license to state and local governmental actors to violate the Michigan Constitution." Slip op at 21. However, a close examination reveals that this is mere rhetoric and misses the mark.

Without dispute, the constitution can delegate to the Legislature the task of devising a comprehensive statutory

33

scheme to protect specific constitutional rights. Art 1, § 2 contains such a constitutional provision, and it is the one involved in this case. It is also beyond dispute that, when one person's constitutional rights conflict with another's, courts will render a decision whereby one right is sublimated to the other.

This dissent, simply stated, stands for the proposition that, when a state actor discriminates against a person in a manner made lawful by the CRA, that person's art 1, § 2 rights are sublimated to the art 1, § 2 constitutional rights of others to have the state actor discriminate in their interest. Art 1, § 2 delegated to the Legislature the power to implement it. In turn, the Legislature authorized the sublimation of one person's equal protection rights over another's when it created § 210.

The majority also distorts the meaning of the dissent when it asserts that I would prevent the Court from hearing plaintiff's claim that defendant discriminated against him. It states that the dissent would prevent plaintiff from recovering for defendant's acts that, although not violative of the CRA, violate the Due Process Clause. However, one should note, it neglects to specify the acts. What conduct by defendant does plaintiff claim violated art 1, § 2, but did not violate the CRA? In fact, plaintiff has named no

governmental action by defendant that survived summary disposition, or that should have, and that, also, violated the Due Process Clause.

Here, Sharp cannot sue under the CRA because of the bar imposed by § 210. Both the nature of his claim and his pleadings preclude the availability to him of a parallel constitutional claim. The CRA provides his exclusive remedy. Because the Court of Appeals properly dismissed this action, I would affirm.